## McGee v. Fidelity & Columbia Trust Company.

(Decided May 14, 1926.)

### Appeal from Jefferson Circuit Court (Common Pleas, Fourth Division).

1. Fraud—Evidence held not to show misrepresentation by which plaintiff was induced to pledge securities for debts of husband.

2. Fraud—Evidence Held Not to Show Fraud in Withholding Information to Induce Plaintiff to Pledge Securities for Husband's Indebtedness.—Evidence held not to show that alleged fraudulent conduct of defendants in withholding from plaintiff information that securities previously pledged by her husband were at the time insufficient to secure his indebtedness induced her to pledge her own securities for his indebtedness.

3. Fraud—Action for Fraud Rests on Reliance on Misrepresentation or Concealment by Party Ignorant of Facts.—Essence of an action for fraud and deceit is injury resulting to plaintiff, because she in reliance on defendant's fraudulent misrepresentation or concealment, being herself ignorant of the facts, acted on such fraudulent misrepresentation, or because of such fraudulent concealment.

JOHN BRICE BASKIN and WOODWARD, WARFIELD & HOBSON for appellant.

TRABUE, DOOLAN, HELM & HELM, for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

Appellant is the wife of J. Wheeler McGee, a prominent man in Louisville, and was likewise the daughter of

John D. Taggart, some years ago prominent in financial circles in Louisville, and who was one of the organizers and the first president of the Fidelity Safety Vault & Trust Company of that city. Prior to the transactions here involved the trust company was consolidated with the Columbia Finance & Trust Company of Louisville, and after the consolidation was named Fidelity & Columbia Trust Company, the appellee herein.

The Fidelity Trust & Safety Vault Company was organized about 1881 or 1882, and appellant's father, John D. Taggart, was its president from its organization until his death in 1898. He left a will wherein he designated that company as both executor and trustee to hold his property in trust for a specified period, which expired in 1902, and likewise provided that at the expiration of such period his executor should convey to a trustee named by appellant that part of his property left to her in trust, and that if she failed to select such trustee then that company should act as such. She never designated any trustee, and that company continued to act as her trustee under her father's will until about 1913, when the same was consolidated with the Columbia Trust Company, and since the consolidation appellee has continued to be and is yet her trustee.

Some time prior to 1918 J. Wheeler McGee, appellant's husband, became indebted to appellee in a large sum, which in September, 1918, amounted to $42,264.00. He had pledged to secure this loan certain stocks and bonds held by him, which up to some time before September, 1918, had been deemed ample security; but because of certain conditions the stocks and bonds so pledged by him had decreased in market value and were no longer deemed at that time sufficient security for the loan. One Malone was at that time an officer of appellee company, and had been since the consolidation, and before that had been an officer of the Fidelity & Safety Vault Trust Company throughout the years when John D. Taggart, appellant's father, had been its president. Malone had enjoyed the confidence and esteem of John D. Taggart during their association and after his death appellant seems to have placed the same confidence in him that her father had previously done. Accordingly throughout the years following her father's death appellant continued to advise and consult with Malone as to her personal business affairs, even after her marriage in 1900 to McGee, as testified to by her.

When on September 26th, 1918, appellant went to the trust company for some purpose, a conversation between her and Malone resulted in her setting apart as additional security for her husband's loan about $14,000.00 in stocks and bonds belonging to her individually, in consideration of granting to her husband additional time within which to meet the loan. Then again on October 28, 1920, she set apart in writing $17,000.00 in liberty bonds to further secure the same loan and for the same consideration. Then again on February 10, 1921, she set apart and pledged as additional security for her husband's loan another $3,000.00 of liberty bonds belonging to her.

On February 28, 1921, J. Wheeler McGee and appellant, husband and wife, joined in a written authorization to appellee to make a sale of the collaterals so held to secure J. Wheeler McGee's debt, including that so pledged by his wife, and after the sale of the collateral of the husband there remained unpaid of his debt something over $19,000.00, which amount was reduced to $14,000.00 by the sale of certain stocks of appellant and the appropriation of a fund of hers on deposit in appellee's institution.

After thus reducing the debt of her husband to $14,000.00, appellant executed her individual note to appellee for that amount, secured by certain stocks and bonds pledged by her.

On October 26, 1923, appellee brought its equitable action against appellant on that note, to which action there was no defense; and sufficient collateral having been sold to cover the debt, interest and cost, the balance was turned over to her.

On the same day appellant filed this action at law for damages against appellee, and after reciting the pledging of her said securities to further secure the debt of her husband, alleges that on September 26, 1918, John T. Malone, then manager of defendant, informed her that her husband's collateral so pledged to secure his indebtedness had depreciated in value, and advised the plaintiff to deposit with the defendant her own securities, and caused a writing to be prepared reciting among other things that in consideration of granting further time to her husband for one year she had pledged her own stocks and bonds, and that Malone caused the plaintiff to sign and deliver said writing to defendant; and that thereafter when she again placed in pledge for the same purpose additional securities of her own Malone, although not then an officer of appellant, but still acting for it,

again induced her at the instance of the president of defendant to sign the writing so setting apart said securities in consideration of further indulgence and deference of payment of her husband's debt; that in each instance the recital of the consideration was a mere scheme or device to obtain and retain plaintiff's said securities, and that Malone, at the time acting for defendant, represented to her that she ought to sign said writing, and that she would suffer no pecuniary loss in so doing, but would save her husband's securities for him. That there was in truth no consideration for the execution of either of said writings, and that plaintiff received no part of the money loaned to her husband by defendant, but that the recital of the consideration was a scheme or device by defendant and its officials to obtain possession of plaintiff's securities as additional security for the debt of her husband and thereby deprive her of the same; that Malone represented to her that the stock pledged by her husband in the first place to secure his loan in the Kentucky Wagon Manufacturing Company was sufficient to pay his indebtedness to defendant, all of which representations made to her by Malone were false and known by Malone and the president and defendant to be false, although not known to be so at the time by plaintiff.

She alleges that her father was one of the incorporators of the Fidelity Safety Vault & Trust Company, and that Malone at the time of its organization became an employe of that company and continued to be until its consolidation as above set forth, and after the consolidation became manager of the consolidated company; that plaintiff's father had a high opinion of Malone and great faith and confidence in him and so informed the plaintiff, and that during all the time Malone was employed by the two companies plaintiff was intimately acquainted with him, and had unbounded confidence in him, and because of his long association with her father and of his confidence in him, she trusted him implicitly, and after her father's death she advised with Malone about all her business affairs and always followed his advice. That Malone knew all of her business affairs and what property she had, and knew that she relied upon his advice in all business matters; and that under her father's will a trust estate was left to her with the Fidelity Safety Vault & Trust Company as trustee, and in all the transactions she had with that company she dealt with Malone and never acted without his advice, and that the president of de-

fendant knew of these relations of confidence existing
between her and Malone. That but for the said repre-
sentations, which misled her and upon which she relied,
and but for her confidence in Malone and the president of
defendant, and but for the confidential relations at the
time existing between plaintiff and defendant, and be-
tween plaintiff and said officers, she would not have
pledged her said securities to the defendant as security
for the payment of her husband's indebtedness; and that
because of these misrepresentations and the deceit and
fraud so practiced upon her by the defendant and its
agents and officers the defendant obtained from plaintiff
and converted to its own use stocks, bonds and other
property of the value of $35,000.00, for which she prayed
judgment.

The answer of defendant first relied on the pendency
of its equitable action against plaintiff on the $14,000.00
note as a plea in abatement; and in the second paragraph
denied the essential averments of the petition. Then in
the third paragraph the defendant purports to give a
history of the whole transaction and alleges, in substance,
that beginning in 1913 and up to July, 1916, plaintiff's
husband had borrowed from it various sums of money, to
secure the payment of which he gave written pledges of
various securities owned by him, which at the time of the
creation of such debts were good, bankable securities,
and represented a value substantially in excess of the
amounts of such indebtedness; that after such pledges by
plaintiff's husband there was a substantial decline in the
market value of the securities so pledged by him, which
decline was due to financial, commercial and manufactur-
ing conditions brought about by the world war beginning
in the year 1914, and by the entry of this country into
that war in the spring of 1917, which conditions con-
tinued up to the filing of the answer; that in September,
1918, the market value of the securities so pledged by
plaintiff's husband in Louisville and elsewhere were ap-
proximately $11,000.00 less than the amount of his said
indebtedness to defendant, although at that time it was
believed by the plaintiff and her husband, and by the de-
fendant and its officers, that eventually with the restora-
tion of normal conditions of peace, commerce and finance
the said securities so pledged by J. Wheeler McGee would
again represent their former value and be worth substan-
tially more than the amount of his said indebtedness.
That owing to certain war conditions in 1917 and 1918

such securities as plaintiff's husband had pledged to secure his loan declined in market value, and for the months immediately succeeding September, 1918, there was an abnormal decline in the value of such stocks; but it was then believed by the plaintiff and her husband and by defendant that a sale at that time of his said securities would involve a tremendous sacrifice of what their ultimate value would be and entail a great loss upon him, and because of this fact the defendant, at the special instance and request of plaintiff's husband for some months prior to 1918, forebore to exercise its right to sell the pledged securities for the payment of his debt, and on September 26, 1918, during a critical period of the war the market value of his securities declined to a point so low that defendant, having due regard for its own financial affairs, felt it was no longer justified in carrying the risk of his said indebtedness and risking a further decline in his said pledged securities. That repeatedly, prior to September 26, 1918, it notified plaintiffs' husband that it would be compelled to enforce its claim and sell the said securities, but said McGee made repeated pleas for indulgence, and the plaintiff united with her husband in such pleas. And that finally on September 26, 1918, after repeated visits by plaintiff and her husband to defendant and repeated appeals by them for delay in the sale of the pledged securities, defendant consented to an extension of one year to said McGee in consideration that the plaintiff should then pledge the securities so pledged on that debt by her. That her said written pledge of her securities on that day was made with a full knowledge of all the facts, and with a full knowledge of the then condition of the securities market affecting the market value of her husband's pledged securities, and was made by her of her own volition without being prompted to do so by defendant or by any one representing defendant, but, on the contrary, was made by her for the sole purpose of aiding her husband and preventing a sale, and as she then considered, a sacrifice of his securities, which action on her part at that time seemed to all of the parties concerned to be the exercise of sound business judgment.

Then as to the subsequent pledges by plaintiff similar allegations are made in explanation of those several transactions.

On the trial the plaintiff filed an elaborate amended petition reasserting the false and fraudulent misrepresentations of defendant and its officers and agents, and in

addition relying upon the alleged fraudulent conceal-
ment by defendant and its agents, of certain facts with
reference to the value of the securities so pledged by
plaintiff's husband, and alleging that if those facts had
not been fraudulently concealed from her she would not
have so set apart her securities as additional collateral
for the loan of her husband.

After the hearing of the plaintiff's evidence, which
consisted almost entirely of the testimony of the plaintiff
herself, the trial court, upon motion of defendant, di-
rected the jury to find a verdict for the defendant, and
from a judgment on that verdict this appeal is prose-
cuted.

The plaintiff's evidence, in substance, on main exam-
ination was that when she went to the trust company on
the 26th of September, 1918, Malone, who was then mana-
ger of that company, said to her that a husband hates
very much to ask his wife for money, and suggested to
her to put up additional security for Judge McGee's loan
of more than $42,000.00 so that his securities already in
pledge might not then be sold, and to the end that she
might ultimately save them from being sacrificed; she
testified, ''.Well, he said it would take my securities, my
$14,000.00 to carry this on—make them safe—a margin;''
that she did not know at that time that the securities
Judge McGee had pledged for the payment of his debt
were worth more than $11,000.00 less than the amount of
his debt, and that Malone did not so inform her, or any
other person at the trust company; that she did not know
at that time that Judge McGee's securities could not be
sold for enough to pay his debt and was not informed of
that fact; then in answer to a question about what Ma-
lone said about her putting up her securities she said,
''My securities were put up to save Judge McGee's from
being sold,'' and it was done at the suggestion of Malone;
that Malone knew all the securities she had in her safety
vault box and told her to go to the box and what securi-
ties to bring back; that she had confidence in Mr. Malone
and did as directed; that her securities so pledged
were purchased by her through the trust company on the
advise of Malone.

As to the second pledging on October 28, 1920, she
said that at time Malone had ceased to be an officer of
defendant but was sent for by the president to come to
the bank where she met him, and he asked her to pledge
the additional $17,000.00 in liberty bonds, and told her at

the time that certain named securities which Judge Mc-
Gee had previously pledged for his debt were paying
good dividends and would pay off everything; that she
did not know that when she put up this additional $17,000
in securities that if the original securities pledged by
Judge McGee and the additional $14,000.00 previously
pledged by her had then been sold they would not have
brought enough to pay his debt, and if she had known
this she would not have pledged her $17,000.00; that she
believed and placed reliance in Malone's statement that
Judge McGee's Kentucky Wagon Works stock was pay-
ing good dividends and would pay everything off; and
that upon the third occasion when she again put up
$3,000.00 of securities she told the bank officials she would
put up no more, and at that time she learned from them
that all the securities had depreciated in value.

Upon cross-examination she stated that she and her
husband throughout their married life had sustained an
ideal relationship, that no couple had ever lived a happier
married life; she says that he made for himself and other
members of his family throughout that period various
investments, and that she had heard him talk about cer-
tain stocks, but really knew nothing about his business
affairs; that up to an illness in October, 1920, her hus-
band was a man of exceptional mental vigor and force;
that upon one occasion her husband came to her and asked
for three $1,000.00 bonds, which she willingly gave him,
one of which was subsequently returned to her, and after
a lengthy questioning admits that she and her husband
went to the trust company together "a great deal;" she
also says in reference to her visit to the trust company on
the 26th of September, 1918, and her conversation then
with Malone, "He says I would like for you to put this up
because Judge McGee is in debt, that is the first time I
knew anything about it—$42,000.00—so that his margin
may be safe to carry it on;" that up to that day she had
never heard of Judge McGee's $42,000.00 debt to defend-
ant, but she put up her $14,000.00 of securities at Ma-
lone's suggestion "in order to make Judge McGee's
debt safe" and without asking her husband anything
about it; that upon that occasion Malone left her under
the impression that Judge McGee's securities would be
sold if she did not put up something to secure the debt;
that she knew when she put up the $14,000.00 in securities
that she was putting it up to make her husband's debt
safe.

She adhered throughout her cross-examination to her original statement that neither Malone nor any other officer of the bank told her upon either occasion that her husband's securities first pledged for his debt were worth less money than his indebtedness. However, during the cross-examination a book of hers kept by her was introduced in evidence. That small book is before us and purports to be a record kept by her in businesslike fashion of the various bonds, stocks and securities held by her with their numbers, their dates, by whom issued, when payable, when the interest was payable and what disposition she had made of them. The entries in that book and the memoranda made therein are admitted by her to be in her own handwriting and to have been made by her in person.

Two entries so made in that book are very enlighten ing upon the issue in this case; one entry, after giving the numbers of seven Louisville Railway Company bonds, recites that one of them is held by the Fidelity & Columbia Trust Company as security for Childs, and then further proceeds:

"The other six of the above Louisville Railway Company bonds, that is to say those numbered 326, 3921, 3922, 3923, 4339 and 5320, were put up with the Fidelity & Columbia Trust Company September 26, 1918, as additional collateral security for my husband's indebtedness to said company of $42,264.00, said indebtedness being further secured by collaterals originally deemed sufficient."

Then, in another entry in the same book, in dealing with certain Rochester Railway Company 5% bonds held by her, after giving the numbers and stating when the principal was due and when the interest payments thereon were due, there is the following recitation:

"September 26, 1918. These three Rochester bonds Nos. 131, 132 and 1113 (next page) held by the Fidelity & Columbia Trust Company as security for my husband's indebtedness to said company of $42,-264.00, said indebtedness being further secured by collaterals originally deemed sufficient."

In an opinion by the trial court he analyzes the evidence of the plaintiff and bases his direction of a verdict for defendant upon his opinion that there was no evidence of misrepresentation by defendant or any of its

officials, and in this result we concur. On this appeal there is no serious contention that the plaintiff's evidence showed any such false misrepresentation, but it is earnestly and ably argued that the peremptory was wrongfully given because the plaintiff's evidence did disclose that the defendant and its officials had fraudulently concealed from the plaintiff, when she so pledged her securities, the fact that her husband's securities were at the time worth less than the amount of his debt; and that as defendant and its officials, especially Malone, sustained toward the plaintiff at the time both a fiduciary and a confidential relationship the duty rested upon them to make the fullest disclosure of all the facts to the plaintiff, including the fact that the value of her husband's securities previously pledged were at the time she also pledged her own securities, worth less than the amount of his debt to appellee.

We strongly incline to the view that appellant's counsel is correct in this contention, and that because of the fiducial relationship of appellee, as well as because of the confidential relationship of Malone toward the plaintiff, that duty devolved upon them; but the additional question remains, from a fair interpretation of her evidence whether, although they did not perform such duties, such failures by them induced her to so pledge her securities.

While plaintiff adhered to her statement that defendant's officials, including Malone, had not disclosed to her the fact of the insufficiency of McGee's securities to pay his debt at the time she pledged her own, she admits the making of the record which we have quoted in her own handwriting, and specifically admits that what that record shows is the truth. Those recitals disclose that she knew at the time she first put up her securities, and necessarily knew at all times thereafter, that her husband's securities previously pledged for his debt, had been deemed originally sufficient to secure its payment, and the recital that they were "originally deemed sufficient" seems necessarily to carry with it the knowledge that they were not then so considered. And if they were not then sufficient to secure his indebtedness the inference that they were then of less value that the amount of his indebtedness seems necessarily to follow. Her counsel is now complaining that defendant's officials fraudulently withheld from her material facts which it was their duty to disclose, although her own evidence shows that she at

the time knew the very facts the failure to disclose which
is now complained of.

Assuming, therefore, that defendant's officials fraud-
ulently withheld from plaintiff that information, and
that they thereby designed to perpetrate a fraud upon
her, it had no such effect upon her, for it did not induce
her to take the action which finally resulted in injury to
her.

The very essence of an action for fraud and deceit
is the injury resulting to the plaintiff because she in
reliance upon defendant's fraudulent misrepresentation
or fraudulent concealment, *being herself ignorant of the
facts,* acted upon such fraudulent misrepresentation or
because of such fraudulent concealment. Obviously if
the plaintiff, being in full possession of the facts so
fraudulently withheld from her by the defendant, pro-
ceeds to take the same action she might have taken in re-
liance upon the defendant's fraudulent concealment, then
the latter's conduct was no inducement to the action she
took.

As stated in Bigelow on Fraud, vol. 1, 540:

"It is fundamental that the representation
should have been acted upon by the complaining
party and acted upon to his injury. Fraudulent con-
duct will not afford ground of action or defense
unless connected with the particular transaction
complained of, *and shown to be the very ground upon
which the party acted and upon which the transac-
tion took place.* And this is as true in equity as at
law."

In the light of the plaintiff's knowledge, disclosed by
the entries in her book, the failure of defendant's officials
to disclose to her the facts now complained of did not
induce her to pledge her securities and was not the
ground upon which she acted. Fraudulent deceit pre-
supposes knowledge of the fact on one side and ignorance
of them on the other. Here we have a knowledge of the
facts on both sides, and the plaintiff acting upon her own
judgment with the knowledge of the fact that securities
previously pledged by her husband were at the time in-
sufficient to secure his indebtedness, pledged her own,
and her action, therefore, was not affected by or induced
by the fraudulent concealment.

As said by Mr. Smith in his work on the Law of
Fraud, chapter 3, page 30:

"Concealment in the law is the suppression of truth to the injury or prejudice of another,"

and we have seen here that the concealment had no such effect.

Mr. Smith also in his work in chapter 2, page 20, in dealing with fraudulent representations where the parties stand in a fiduciary relationship, says that such concealment renders the transaction fraudulent if

"previous to the transaction a fiduciary relationship has existed between the parties which imposes the utmost good faith as an obligation upon each, and impresses each transaction between them with trust and confidence, compelling a disclosure of every material fact and circumstance *known to one and not known to the other, operating as an inducement to the contract.*"

Plaintiff's evidence in chief shows she knew the purpose of pledging her securities was to prevent the sacrifice of her husband's, and her evidence on cross-examination is convincing she knew his securities were of less value than the amount of his debt.

Judgment affirmed.